# JACKSON A. LONG et al., Respondents, v. FANNIE H. RUCKER et al., Appellants.

### Kansas City Court of Appeals, March 2, 1914.

1. **SLANDER OF TITLE: Damages.** Any person who possesses an estate or interest in land may maintain an action against any one who falsely and maliciously denies or defames his title, and thereby inflicts pecuniary damages upon him.

2. ———: **Landlord and Tenant.** A tenant may maintain an action against his landlord for a false and malicious publication of a slander against the tenancy, if damage has resulted from the slander.

3. ———: **Pleading and Proof.** In action for slander of title it devolves upon the plaintiff to plead and prove that the words were false, maliciously uttered and resulted in pecuniary loss.

4. ———: **Malicious Intent: Evidence.** The action cannot exist without a malicious intent and to infer the existence of malice the evidence must support a reasonable inference that the representation was not only without legal justification, but was not innocently or ignorantly made.

5. ———: **Cause of Damage.** Where the evidence shows that the reletting and the slander are all parts of one attempt and purpose, i. e., to get rid of an unexpired leasehold, and that the slander was the effective agency in so doing, defendant cannot escape by claiming that the reletting and not the slander caused the damage.

6. ———: ———: **Malice: Jury Question.** Where fair-minded men may take different views of the evidence on the issue of malice it becomes a question of fact to be determined by the jury.

7. ———: ———: ———: **Advice of Counsel.** Where defendant was put on the stand by plaintiff and testified on cross-examination that he acted in good faith on the advice of counsel who was then dead, plaintiff was not concluded thereby since there was other evidence in plaintiff's favor on this issue.

8. ———: ———: ———: ———. It is for the jury to say upon the evidence whether advice of counsel was sought and acted upon in good faith and whether there was a truthful as well as a fair and full disclosure of the facts.

9. ———: ———: **Husband Agent of Wife.** Where the fee of the property leased was in the wife as her separate property and

the husband was acting as her agent in the leasing of and caring for it, and in such work the husband maliciously utters false statements in reference to plaintiff's leasehold title which result in pecuniary loss to plaintiffs, both husband and wife are liable for slander of title.

10. ———: **Excessive Verdict.** Although a verdict is excessive it will not in the absence of other error be remanded for a new trial if the excess is specific and accurately fixed by the evidence. The excessive verdict can be cured by compelling a remittitur of the excess.

AFFIRMED (CONDITIONALLY).

Appeal from Boone Circuit Court.—*Hon. D. H. Harris,* Judge.

*W. M. Williams, C. D. Corum* and *E. W. Hinton* for appellants.

(1) Plaintiffs cannot recover damages due to the unpleaded act of renting the building. They plead that the damage was due to the alleged slanderous conversation which took place after the building had been rented, and must stand or fall on this allegation. Rhodes v. Bugg, 148 Mo. 714. (2) It is not essential to the validity of the defense of advice of counsel that immaterial facts should have been communicated. 19 Am. Eng. Cyc. of Law (2 Ed.), p. 688. (3) When plaintiff introduces the testimony of a witness, even though that witness be the defendant himself, if his testimony is uncontradicted and not absolutely opposed to the physical facts in the case, it must be accepted as true and plaintiff must abide the results of his testimony. Claflin & Co. v. Dodson, 111 Mo. 201; Chandler v. Fleeman, 50 Mo. 240. (4) Where a petition limits the amount of plaintiff's damage for an itemized injury, the instruction should likewise limit the recovery to said amount. Finley v. Railroad, 238 Mo. 6; Rodke v. Basket Co., 229 Mo. 1; Mort v. Kansas City, 194 Mo. 513; Wright v. Jacobs, 61 Mo. 19.

*Harris & Finley* and *Walker & Walker* for respondents.

(1)    There was sufficient evidence to support the finding of the jury as to the reasonable worth of plaintiffs' stock of goods, fixtures, business and lease. Aside from all the circumstances in evidence, the price alone for which said property was actually sold after the slander was sufficient evidence of value. Garlington v. Railroad, 34 Tex. Civ. App. 274, 78 S. W. 368; Watson v. Railroad, 57 Wis. 332, 15 N. W. 468; Rickey v. Tenbroeck, 63 Mo. 567; Johnson & Co. v. Ice & Ref. Co., 143 Mo. App. 452; Loe v. Railroad, 57 Mo. App. 356.

TRIMBLE, J.—The case herein considered was before the court, at the March, 1912, term, on an appeal by plaintiff from an order of the trial court refusing to set aside an involuntary nonsuit brought about by a ruling that plaintiffs' evidence did not entitle them to go to the jury. That ruling was disapproved and the cause was reversed and remanded in order that the issues of fact therein might be submitted to a jury. [Long v. Rucker, 166 Mo. App. 572.] In accordance with that decision a trial has been had, the issues have been submitted, and the jury has returned a verdict for plaintiffs in the sum of $2738.24 actual, and $100 punitive, damages. The court rendered judgment thereon and defendants appealed.

The case is for damages for slander of title to real estate. A detailed statement of the facts need not be repeated here since they are set forth in the former opinion. However, in order that the questions involved may be easily kept in mind, it may be well to state that the defendant, Fannie H. Rucker, was the owner of a store building in Columbia and that her codefendant William H. Rucker, was her husband and her agent acting for her in the renting of said property and in the general business of looking after it. Plaintiffs held a

written lease on said building, which had one more year to run, at a rental of sixty-five dollars per month. They became financially embarrassed and owed a number of debts, among them one of about $1500 to Mr. R. B. Price, Jr., a banker. Their assets, however, exceeded their liabilities. About March 19, 1910, they found a purchaser of their business, a Mr. Kistler, who agreed with them orally that he would buy their stock and unexpired leasehold for $4200. To do this he made an arrangement with Mr. Price whereby the latter was to lend him a portion of the money, otherwise he would be unable to buy the stock. Mr. Price agreed to lend him the money and the understanding and agreement was that the purchaser would take the stock and continue the business at the old stand. The agreement was fully reached on Saturday, March 19, 1910, at noon, and Kistler was ready to take possession, but owing to their inability to obtain the release of a certain claim until the following Monday it was agreed that the trade would be finally closed on Monday as the holder of the claim would return and make a release on that day.

Saturday afternoon about three or four o'clock, after the agreement had been reached, the defendant, William H. Rucker, went to one of the plaintiffs, Clarence A. Long, and asked him about their business and this plaintiff told him they had fixed up a sale and was going to sell the business to Mr. Kistler. Rucker replied "you tell Kistler to see me before he buys the place." Long told him he still had a lease for a year on the building. To which Rucker replied, "Well, you tell Kistler to see me," but gave no reason why Kistler should see him.

Some time that same day (Saturday) Price saw William H. Rucker and discussed the matter with him and asked him not to do anything that would be detrimental to the interests of plaintiffs' creditors and Rucker promised not to do so, and about seven o'clock

that evening Price learning that other persons were trying, if possible, to get hold of the location, telephoned Rucker asking him not to take any action that would prejudice the interests of creditors, and thereupon Rucker assured him positively that he would not, and made an appointment to come to the bank Monday and see Price about it before doing anything. He did not keep the appointment, although he admits he was in a store just across the street from Price's bank. About three o'clock on Monday afternoon Rucker leased the building to another firm. Price heard through other sources that Rucker, in violation of his agreement, was negotiating with other parties, but did not believe it. Tuesday morning Rucker went to see Price. As to what took place, Price testified as follows:

"Q. Tell what was said then. A. Well, I had heard on Monday, through a traveling man, that Mr. Rucker was negotiating elsewhere and as reports of that kind often get out I didn't believe it but on Tuesday when Mr. Rucker came in I told him that the creditors of Long and Son would insist upon the continuance of the Long lease and he said that they had no lease whatever, and I said, ''Well, they expect to hold possession of the property under the lease'' and he said that ''anybody who went in there would have a fight.''

Plaintiff at this point attempted to have the witness explain what he meant in the foregoing testimony, but on objection from the defendants, this was not allowed. Price then testified:

"Q. Well, tell what he said. A. He said that any one who went in there would have a fight and as we continued the conversation of course we talked for twenty or thirty minutes and I don't remember everything that was said but he finally wound up, after I had stated again that they expected to hold the premises, he said 'Well, damn them, I will show 'em,' and

Long v. Rucker.

he left and that is the last time I had any conversation with him."

"Q. Well, was this money furnished Kistler and the deal closed? A. No.

"Q. Tell the jury why. A. Well, after these statements from Mr. Rucker I would not—I knew that there was a lawsuit—that Mr. Rucker intended to fight possession and I was not willing to furnish the money to go in and buy a lawsuit.

"Q. Did you so report to Mr. Kistler? A. No. Mr. Kistler sent word to me; why didn't we close it up—my his son—and I just told him the deal was off, or something of that kind.

"Q. In that last conversation with Mr. Rucker did he give you his reasons for his statements?

"By Mr. Corum: Let him tell what he said.

"By the court: Very well. Just state everything that was said.

"A. Well, we talked for twenty or thirty minutes and of course in a conversation of that kind a man could not remember the exact conversation, but the gist of it was that he was not going to let anybody go in there and that he wanted possession of that property and that is what I understood from his conversation."

And on cross-examination, Price further testified:

"Q. And then he said that anybody that went in there would have a fight? A. Yes, sir.

"Q. And you understood from that language that he meant a fight in court—a lawsuit? A. Yes, sir.

"Q. *And then you ceased to negotiate further with Mr. Kistler?* A. Yes, sir.

"Q. You sent word to him by his son that the deal was off? A. Yes, sir. His son was sent to me to know why I hadn't closed the deal.

"Q. And you sent word that the deal was off? A. yes, sir.

"Q. Was that all the word that you sent Mr. Kistler? A. Yes, sir; that is all I remember."

Plaintiffs being thus deprived of the benefit of a sale to Kistler, was compelled to turn over their stock to creditors and it was sold for $1461.76 instead of $4200 as it would have been had Kistler been able to get the money Price had agreed to lend him and to get the unexpired lease which would enable him to continue the business at the old location which was a valuable element in a business of that kind.

Plaintiffs' cause of action is based on the charge that defendants maliciously, and without probable cause, stated to Price that "they (meaning the plaintiffs) have no lease whatever" and that "any body that goes in there (meaning into said premises) will have a fight," and that on being told that the plaintiffs expected to hold said premises under said lease, defendant Rucker also said to Price "Damn 'em, I will show them."

To our minds the evidence shows very clearly that the determined and unnecessarily vitriolic attack made by Rucker on plaintiff's leasehold title defeated the consummation of the sale to Kistler and directly resulted in loss to plaintiffs. [Long v. Rucker, 166 Mo. App. 572, l. c. 578; Paull v. Halferty, 63 Pa. St. 46; Gott v. Pulsifer, 122 Mass. 235; Andrew v. Deshler, 45 N. J. Law 167; Hopkins v. Drowne, 41 Atl. 567.] It will not do to say, as matter of law, that it was the unpleaded act of Rucker in leasing the building late Monday afternoon that defeated the sale. Possession of the store was still in plaintiffs' control and it was not until after Rucker's statements and belligerent announcement that Price allowed the deal to drop. In fact, the evidence as a whole will bear the inference that the attack on plaintiffs' title and the execution of another lease were but parts of one and the same transaction in which the warlike statement and ultimatum to Price was the more important of the two, and produced the effect intended.

It is drawing too fine a distinction to say that Rucker was not saying the Longs had no lease but that their creditors had none. Rucker had been told that the Longs lease and the stock was to be sold to Kistler, and he knew that it was only in this way—that is, under the Long lease—that anyone would seek to hold possession. So that the validity of plaintiffs' leasehold title was in reality the subject in dispute no matter whom the parties may have had in mind. But, however this may be, the jury could rightfully draw the inference that they were talking of the Long lease, and of the Longs.

The evidence was also sufficient to go to the jury on the question of malice notwithstanding Rucker's testimony. The jury were not compelled to believe everything he said. And they had a right to look to all the testimony to determine whether or not he acted in good faith. And since the evidence is sufficient to support an inference that the attack was not made in good faith, the verdict of the jury finding malice must be respected. There was evidence tending to show that Rucker had a motive in destroying the remaining year of the lease; he could rent the building for $100 instead of sixty-five dollars. There is evidence that he knew plaintiffs were going to sell to Kistler; that, without giving any reason, he did not want Kistler to buy until he saw him; that he would have let Naysmith buy the unexpired lease if he had bought the stock. The failure to keep the appointment with Price on Monday although he was just across the street; the subsequent going to Price, and the unusual strength of the language used to impress upon Price—the most effective point at which to strike—that he was going to fight and contest the validity of the unexpired term, although up to that time he had recognized plaintiffs as lessees; and the fact that he is contradicted by Price in a number of important particulars, and by one of the Longs in others; all these furnish sufficient grounds

justifying the jury in finding against him. In addition to this, there was evidence tending to show that for a long time prior thereto, Moscow Brothers, defendant Rucker, and his attorney were considering the matter of renting the building to the Moscow Brothers, but the time and opportunity were not then thought ready. Where fair-minded men may take different views of the effect of the evidence on the issue of malice it becomes a fact to be determined by the jury and not merely one of law to be determined by the court. [Merriwether v. Knapp, 224 Mo. 617.] And although defendant testified that he acted in good faith on the advice of his counsel, who was then dead, still, there being other evidence in plaintiffs' favor on this issue, plaintiff was not concluded thereby. [Ayers v. Railroad, 190 Mo. 228.] The fact that defendant Rucker consulted counsel is not a conclusive defense, nor is the fact that counsel may have advised him there was no lease. In general it is for the jury to say upon the evidence whether the advice of counsel was sought and acted on in good faith and whether there was not only a truthful but a full and fair disclosure of the facts. [19 Am. & Eng. Ency. of Law (2 Ed.), 689.] There is evidence tending to show that certain things told counsel as to what the lessees had said as to their ability and intention to pay rent were untrue.

But defendants argue that Price never told Rucker that he was going to lend Kistler the money to buy the stock and hence Rucker did not know he was liable to injure plaintiffs. There is testimony showing that he did know Kistler was going to buy, and it seems he went to the only one who was in a position to prevent it.

There was no issue raised in the lower court that there was an unfair sale of the property or that plaintiffs were lacking in diligence in the sale thereof. In fact, if the sale to Kistler fell through they were helpless, since the creditors, who had waited to give plain-

tiffs a chance to sell to Kistler, immediately enforced their demands and took charge of the property, and as they sold it, the presumption is they would not have needlessly sacrificed it, especially as it did not bring enough to pay their debts. If it was sacrificed, plaintiffs could not help it and their helplessness was brought about by defendants' act according to the finding of the jury. Plaintiffs had a buyer for it and the lease at $4200 and defendants' act deprived them of that price. No contest having been raised over these matters in the trial court, they are not sufficient now to reverse the judgment.

Objections are made to the action of the trial court in certain rulings on evidence and in the giving of instructions. A careful examination of each discloses that they are without merit. The evidence showed the building was Mrs. Rucker's separate property and that Mr. Rucker was her agent. It is also sufficient to support a reasonable inference that the statements were false, were uttered maliciously and resulted in pecuniary loss to plaintiffs; and that they were uttered as a part of the business of getting rid of a lease at sixty-five dollars per month in order to obtain one at $100 per month. The defendants are, therefore, under the verdict, jointly liable. [Flesh v. Lindsay, 115 Mo. 1, l. c. 19; Kellar v. James, 14 L. R. A. (New Series) 1003, l. c. 1009.]

It is disclosed by the evidence, however, that in the stock sold was a soda fountain on which there was a chattel mortgage to the makers thereof for $700. It is nowhere shown in the evidence that in the sale to Kistler for $4200, he was to assume this debt. We do not think the evidence supports an inference that he was to assmue it, nor can we look to the evidence in the other trial to ascertain that fact. Consequently, according to the evidence what plaintiffs would have really gotten out of the stock if they had been permitted to close the deal with Kistler was $3500 instead

of $4200. The verdict is therefore excessive by $700 owing to the jury's failing to observe that, if $700 of the purchase price was to be used in paying off this lien, plaintiffs would get only $3500 for the stock. It does not follow, however, that the case must be reversed and remanded and the parties put to the expense and trouble of another trial. In this case the excess is specific and is accurately fixed, and the error can, therefore, be cured by requiring a remittitur to be entered. [Smoot v. Kansas City, 194 Mo. 513; Howard v. Railroad, 110 Mo. App. 574, l. c. 583.]

If, therefore, plaintiffs will, within ten days from the announcement of this opinion, enter a remittitur of $700 with interest at the rate of six per cent from January 18, 1913, the date of the rendition of the judgment, the cause will be affirmed, otherwise it will be reversed and remanded. All concur.